Argued and submitted July 25, reversed and remanded for reconsideration
December 17, 1997

In the Matter of the Compensation of
James I. Weathers, Claimant.

SAIF CORPORATION,
*Petitioner,*

*and*

DEPARTMENT OF CORRECTIONS,
*Employer,*

*v.*

James I. WEATHERS,
*Respondent.*

(93-09767; CA A93738)

950 P2d 405

Julene M. Quinn, Special Assistant Attorney General, argued the cause for petitioner. With her on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Victor Calzaretta argued the cause and filed the brief for respondent.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

SAIF Corporation (SAIF) appeals an order of the Workers' Compensation Board affirming claimant's occupational disease claim for stress-related depression. The first question is whether the Board applied the correct legal standard; the second question is whether the Board correctly applied that legal standard to the facts. We review for errors of law and remand for further consideration.

Claimant began working for the Department of Corrections in September 1982. He suffered a compensable back injury in 1988, for which he received an award of permanent disability and vocational training for a new job. On May 20, 1990, claimant began a trial service period as a corrections counselor at the Santiam Correctional Institution (SCI). For the first two years he worked in an "underfilled" position, which means that he did not have the requisite training or experience at the time but would obtain the training and experience on the job. In July 1992, he was reclassified as a corrections counselor.

Also in July 1992, it was learned that several correction counselors would need to be transferred to another state institution in Portland. SCI was required to decide which employees to transfer because no counselors volunteered. It was understood all along that the transfers would be based on inverse seniority. However, the question arose whether claimant's time spent as an underfill employee would be counted in determining his seniority.

Claimant and the other corrections counselors are members of AFSCME, a public employee union. During this time, they were subject to a 1992-94 agreement between the State of Oregon, the Department of Corrections and the union. In July 1992, a personnel officer from the State Employee Services Division sent a memorandum to one of the corrections counselors, who might be affected by the transfer. In it, she wrote that workers would receive credit for their time spent in trial service pursuant to Article 44 of the employment contract. Claimant learned of the memorandum and its contents. Under Article 44, section 3, an employee was considered to be part of the classification for which he or

she was training when a layoff occurred and received credit for seniority for time spent in an underfill position. Additionally, seniority was defined as the employee's total length of continuous service with the agency. Based upon these initial communications, claimant assumed in 1992 that he would not be transferred.

In April 1993, with the deadline for transfer approaching, the manager of the employee relations unit for the Department of Corrections sent a letter to the AFSCME representative outlining the department's position on the seniority question. The department concluded that persons who were in an underfilled position would be considered to be in the classification for which they were training for purposes of the transfer.

The AFSCME representative took the opposite view. In June, she wrote back indicating that there was no reason to conclude that employees working in an underfilled position should be given credit for service in the classification for which they were training.

Despite the fact that the union's position was inconsistent with the position SCI had taken all along, SCI acquiesced in the union's position. Claimant was notified that he would be transferred to the Columbia River Correctional Institution in Portland effective July 20, 1993.

At this point, claimant became depressed. He began seeing a psychiatrist, who diagnosed a major episode of depression. Claimant filed this claim on July 27, 1993.

The claim was denied by SAIF on August 16, 1993. On review, the administrative law judge (ALJ) set aside SAIF's denial and remanded the claim to the insurer for processing. Specifically, the ALJ made the following findings:

> "Claimant was notified that he was being transferred by letter dated June 14, 1993 * * *. He was then sent a memo on July 19 indicating that the transfer would be effective July 20, 1994.[1] * * *

---

[1] The ALJ mistakenly identified the effective date as July 20, 1994. The record establishes the correct effective date as July 20, 1993.

"At this point, claimant became very depressed and stressed out as a result of the manner in which the transfer had occurred. He had been led to believe all along that he was at no risk for a transfer and then at the last minute the State changed its mind and transferred him in violation of the terms of his union contract. Accordingly, claimant returned to his psychiatrist, Dr. Mead, who[m] he had previously seen for treatment. Dr. Mead diagnosed a major episode of depression. Ultimately, claimant was taken off work and has not yet returned to work.

"* * * * *

"The major contributing stressor that Dr. Mead identifies as the cause of claimant's depression was the unreasonable transfer of claimant from SCI to CRCI."

The ALJ then issued the following conclusions and opinion:

"Claimant must establish that the employment conditions that produced his stress existed in a real and objective sense, that there is a generally recognized diagnosis, that there is clear and convincing evidence that the disorder arose out of and in the course of employment, and that the condition which produced the disorder are conditions other than conditions generally inherent in every working situation or reasonable disciplinary, corrective or job performance evaluations actions by the employer, or cessation of employment or employment decisions attendant upon ordinary business or financial cycles.'

"* * * * *

"The employer acted unreasonably in leading claimant on to believe that he would not be subject to the transfer and then within a matter of days switched its position completely without any explanation and without any good reason to do so. The employer certainly had the opportunity to present evidence to explain its action. None of the witnesses were able to do so. As far as I can tell from this record, claimant is the only employee who has ever been treated in this manner in terms of not getting any credit for his underfill time. Claimant was not transferred by his union, although his union certainly did not do him any good in this instance. Claimant was transferred by his employer.

"* * * * *

"Here, claimant's stress was caused by the circumstances and manner of the lay-off and is, therefore, related to the employment relationship and can be considered a condition of employment."

The Board adopted and affirmed the ALJ's order, with supplementation. That supplementation centered on the unreasonableness of the transfer based on its conclusion that the transfer violated the terms of the union contract. The Board found:

"In May 1992, the employer determined that, in order to meet anticipated changes in the State's post-prison release program, it would have to transfer two corrections counselor positions from its facility in Salem to its facility in Portland. The employer * * * notified its employees, via their public employees union, that, pursuant to its contract with the union, transfer of personnel to staff the relocated positions would be based on inverse seniority. In the interim (based on inverse seniority), two corrections counselors were temporarily transferred to Portland. Claimant was not one of the two.

"On several occasions over the next year, claimant was advised that the total time performing the counselor job (including the two years underfilling that position) would be credited in calculating seniority. A representative for the union replied that underfill time should not be considered. The employer thereafter revised its seniority list and, on July 19, 1993, notified claimant that he was slated for permanent transfer to the Portland facility effective July 20, 1993.

"Claimant became depressed by what he perceived as an unreasonable last minute decision to transfer him to Portland, and he sought treatment * * *."

The Board ultimately concluded:

"Consequently, we conclude that, in light of the plain language of Article 44, the employer's actions in not crediting claimant with the total time he performed the counselor job (including the two years underfilling that position), were in violation of its legal contract and, thus, unreasonable."

The compensability of a mental disorder under Oregon's Workers' Compensation laws is governed by ORS 656.802, which provides, in part:

"(3) Notwithstanding any other provision of this chapter, a mental disorder is not compensable under this chapter unless the worker establishes all of the following:

"(a) The employment conditions producing the mental disorder exist in a real and objective sense.

"(b) The employment conditions producing the mental disorder are conditions other than conditions generally inherent in every working situation or reasonable disciplinary, corrective or job performance evaluation actions by the employer, or cessation of employment or employment decisions attendant upon ordinary business or financial cycles.

"(c) There is a diagnosis of a mental or emotional disorder which is generally recognized in the medical or psychological community.

"(d) There is clear and convincing evidence that the mental disorder arose out of and in the course of employment."

Here, the Board found, and SAIF does not now dispute, that claimant has a recognized mental disorder. SAIF makes four assignments of error on review. First, SAIF asserts that any mental disorder arising out of an employer's decision to transfer an employee is not compensable because it is not a condition of employment, but, in the alternative, if it is a condition of employment, it is one generally inherent in every working situation and, thus, not compensable. Second, SAIF argues that the Board erred in addressing the question of whether employer's actions violated the terms of the contract, because the Board lacks jurisdiction to determine employment rights between a worker and an employer. Third, SAIF claims that the Board erred by determining the reasonableness of employer's actions based almost solely on whether employer's interpretation of the employment agreement was correct. And fourth, SAIF says that the Board erred in concluding that employer violated the contract. We address only the first assignment of error, as it is dispositive.

The first issue is whether the Board applied the correct test in concluding that claimant's depression was caused by an employment condition not generally inherent in every working situation. We hold that the Board articulated the correct test but erred in its application. In *Bogle v. Department of General Services*, 136 Or App 351, 901 P2d 968 (1995), we pointed out that "the circumstances or manner of possible layoff or job transfer are events intrinsic to the employment relationship[.]" Unusual stress related to those events, however, may produce a compensable illness. In *Elwood v. State Acc. Ins. Fund Corp.*, 298 Or 429, 433, 693 P2d 641 (1985), the Supreme Court stated that the line runs between illness resulting from the stress of actual or anticipated unemployment, which is not compensable, and illness resulting from the circumstances and manner of discharge, which can be regarded as events still intrinsic to the employment relationship before termination and can lead to compensation.

■■ Thus, a transfer, in and of itself, is a condition generally inherent in every working situation. However, the manner and circumstances surrounding the decision to transfer, and how it is carried out, may result in a compensable mental disorder. Further, it is not a question of whether the employer, the union, or both caused claimant's illness; as long as the illness was caused by a condition of employment, and that condition is not generally inherent in every working situation, it is compensable. Thus, the Board was substantially correct in its articulation of the law.

■ However, the Board erred in its application of the law by relying almost wholly on its conclusion that employer violated the union contract. In fact, whether employer violated the contract is not determinative. For example, assuming that employer *did not* violate the union contract, claimant could still prevail on his claim. The Board could find that the employer led claimant to believe that he would not be transferred, and then at the last moment changed its position, and that those actions resulted in claimant's depression. Additionally, claimant was the only employee ever to be treated this way. The medical testimony could support a finding that those actions resulted in claimant's depression. The

employer's actions exist regardless of whether employer acted consistently with the terms of the contract.

■ The Board also relied on its finding that employer acted unreasonably. The test is whether the manner and circumstances of the transfer caused the mental illness and whether those circumstances are generally inherent in every transfer. The reasonableness of employer's conduct may be a factor when considering whether the circumstances of the transfer are generally inherent in every transfer and whether they affected claimant's perception of employer's actions, but reasonableness is not the test.

Although the Board, at times, alludes to the facts and circumstances surrounding the transfer as the cause of claimant's depression, we cannot assume that it would come to the same conclusion had it not relied on its belief that employer's actions were in violation of the contract. Accordingly, we remand for further consideration.

Reversed and remanded for reconsideration.